**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION - GREENBELT**

| | |
|---|---|
| **RAHUL JINDAL**<br>**404 Hilton Head Court**<br>**Silver Spring, MD 20905,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**UNIFORMED SERVICES UNIVERSITY**<br>**OF THE HEALTH SCIENCES**<br>**104 Wood Rd**<br>**Bethesda, MD 20814,**<br><br>**and**<br><br>**WALTER REED NATIONAL MILITARY**<br>**MEDICAL CENTER**<br>**4494 Palmer Rd N.**<br>**Bethesda, MD 20814**<br><br>    **Defendants.** | **Civil Action No. 21-884**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR EQUITABLE AND**
**MONETARY RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiff Rahul Jindal brings this suit against Defendant Uniformed Services University of the Health Services (USUHS) and Defendant Walter Reed National Military Medical Center (WRNMMC) for their unlawful retaliation against Plaintiff, in violation of the Whistleblower Protection Act, after he engaged in whistleblowing.

**PARTIES**

1.  Dr. Rahul Jindal, MD, PhD, MBA, was employed by Department of Defense (DOD) at the Uniformed Services University of the Health Sciences (USUHS) as a professor of surgery and worked at Walter Reed National Military Medical Center (WRNMMC) as a staff member.

2.  Uniformed Services University of the Health Services (USUHS) is a health science university of the U.S. federal government. Their primary mission is to prepare graduates for service to the U.S. at home and abroad in the medical corps as medical professionals, nurses, and physicians.

3.  Walter Reed National Military Medical Center (WRNMMC) is a United States' tri-service military medical center, located in the community of Bethesda, Maryland.

**JURISDICTION AND VENUE**

4.  This Court has personal jurisdiction over USUHS and WRNMMC because USUHS and WRNMMC conduct regular business in Maryland and because they maintain regular and systematic contacts with Maryland.

5.  This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of United States, specifically 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 2302(b)(9).

6.  Venue in this district is proper under 28 U.S.C. § 1391(b) because it is the judicial district where the unlawful retaliation for whistleblowing was alleged to have been committed and because USUHS and WRNMMC may both be found in this district.

7.  Jindal has exhausted the administrative remedies available to him. Jindal filed a complaint with the Office of Special Counsel (OSC) on September 24, 2020 (OSC File No. MA-20-002803). As of January 23, 2021, more than 120 days had elapsed from the time Jindal

sought corrective action from the Office of Special Counsel, and he has not been notified by the Special Counsel that the Special Counsel has completed its investigation or that it shall seek corrective action on his behalf.

8. Jindal filed a Merit Systems Protection Board (MSPB) Individual Right of Appeal (IRA) on February 5, 2021 and Administrative Law Judge Andrew Niedrick was assigned to the matter.

9. On February 22, 2021, USUHS filed a motion to reassign the appeal to a "properly appointed" Administrative Judge or to dismiss it without prejudice until a new Board is confirmed. In support of the motion, USUHS argued the AJ lacked the authority to decide this appeal based on the U.S. Supreme Court's opinion in *Lucia v. Securities Exchange Commission*, 138 S. Ct. 2044 (2018). The issue of whether the Court's holding in *Lucia* is applicable to Board (AJs is pending before the Board from an Interlocutory Appeal.

10. On February 26, 2021, AJ Niedrick dismissed Jindal's IRA appeal without prejudice "in the interest of administrative efficiency" to "allow a newly confirmed Board to address" the issue raised in USUHS's motion.

## FACTUAL ALLEGATIONS

11. Dr. Jindal began working for the Uniformed Services University of the Health Sciences (USUHS) on August 8, 2008 as a professor of surgery.

12. Dr. Jindal's privileges to perform solid organ transplants and other surgeries were at Walter Reed National Military Medical Center (WRNMMC), where he was also a staff member.

13. USUHS and WRNMMC were Dr. Jindal's joint employers.

**Dr. Shane E. Ottmann came to WRNMMC in 2012, and he created an intimidating, hostile, and offensive work environment in the transplant program.**

14. Dr. Shane Ottmann was hired as WRNMMC's chief of the Army-Navy transplant program in 2012 and served as transplant consultant to the army surgeon general.

15. Dr. Ottmann repeatedly ridiculed Dr. Jindal's accent and country of origin.

16. Dr. Ottmann told Dr. Jindal that he should "go back" to India and that there were "too many Indian doctors" at USUHS, WRNMMC, and generally in the U.S.

17. Dr. Ottmann made sexist comments to employees, including to Dr. Erin M. Bohen, director of transplant nephrology, and a nurse named Caroline Aker.

18. Dr. Ottmann chronically canceled clinics and multi-disciplinary meetings at WRNMMC so that he could do *locum tenens* work at private hospitals on Federal Government time and generate extra income for himself.

19. Dr. Ottmann accused Dr. Eric A. Elster of turning down a potential donor kidney on a Saturday (January 26, 2013) because Dr. Elster's daughter had ballet practice that day.

20. Dr Ottmann repeated these remarks to Drs. Jindal, Bohen, and Perdue, and to nephrologists, fellows, and numerous nurses and residents working at that time in the transplant unit.

21. This incident was known to the leadership at WRNMMC, but they failed to investigate and take any action.

22. Patients, including veterans, typically wait several years to obtain a suitable kidney transplant and some die on the waiting list. This veteran likely suffered a reduction of lifespan and poorer quality of life by not obtaining a kidney transplant, which was his legitimate right.

23. This action by Dr. Elster, if true, was a serious ethical lapse by Dr. Elster as it directly contravenes the regulations of the Federal Government's regulatory body (the United Network for Organ Sharing).

24. If this incident is not true, Dr. Ottmann falsely accused Dr. Elster of a serious and career-ending ethical lapse.

25. In either case, WRNMMC and USUHS leadership should have informed the United Network for Organ Sharing and carried out a formal IG investigation.

26. Dr. Ottmann unsuccessfully attempted to eliminate Dr. Jindal's position in 2015 and 2016.

**Dr. Jindal and others complained repeatedly about Dr. Ottmann.**

27. Dr. Jindal repeatedly complained to Dr. Elster about Dr. Ottmann from 2013 until his departure from WRNMMC in 2017.

28. Dr. Elster did not provide any assistance and instead instructed Dr. Jindal to "give him [Dr. Ottmann] time to mature in his role" and to "work things out with him."

29. Dr. Elster told Dr. Jindal that he should be "subservient" to military personnel (e.g., Dr. Ottmann).

30. Dr. Bohen filed a complaint against Dr. Ottmann in 2016 and again in 2017.

31. On October 19, 2018, Dr. Bohen stated under oath to the IG of USUHS that "Dr. Ottmann has a personality disorder that he was disruptive in meetings; and that he would scream at people in the hallways and bad mouth other providers."

32. Ms. Aker filed complaints against Dr. Ottmann in 2016 and 2017, accusing him of asking her to do unethical things and harassing her.

**Dr. Jindal filed a complaint with the Maryland Board of Physicians against Dr. Jason S. Hawksworth.**

33. On January 21, 2014, a former patient of Dr. Jindal approached him after the patient had surgery performed by Dr. Jason Hawksworth.

34. The patient reported that Dr. Hawksworth had not properly warned her of the risk of surgery.

35. The patient suffered multiple injuries to the neck and chest due to attempts to place central lines, leading to prolonged hospitalization while the source of pain (assumed to be from liver cysts) continued unabated.

36. Dr. Jindal urged the patient to complain to the Maryland Board of Physicians, but the patient and her husband insisted that she wanted Dr. Jindal to report it.

37. Dr. Jindal then filed a complaint with the Maryland Board of Physicians against Dr. Hawksworth under the pseudonym "John Lyndsay."

**Dr. Hawksworth became Head of Transplant Surgery.**

38. Dr. Ottmann's hostile, racist, and sexist behavior continued from 2012 through 2016.

39. After complaints from other staff members, including Dr. Bohen and Ms. Aker, WRNMMC forced Dr. Ottmann to step down as Head of Transplant Surgery.

40. Dr. Jindal stepped in as the interim head of transplant surgery after Dr. Ottmann had vacated the position.

41. Dr. Ottmann left WRNMMC in 2017.

42. In early 2017, Dr. Hawksworth was appointed head of transplant surgery.

43. After his appointment, Dr. Hawksworth immediately began to target, and to create a hostile, offensive, and intimidating environment against, Dr. Jindal, Dr. Bohen, and Ms. Aker.

44. Ms. Aker filed a complaint regarding her treatment by Dr. Hawksworth.

45. Dr. Hawksworth, in statements similar to those made by Dr. Ottmann, said he could not understand Dr. Jindal's accent; he asked Dr. Jindal why he worked at USUHS; and he asked why "so many Indians" worked at USUHS and in the U.S.

46. Dr. Hawksworth said that "foreign doctors were generally inferior to US-trained physicians."

47. Dr. Hawksworth baselessly accused Dr. Jindal of having a romantic sexual affair with Dr. Bohen.

48. Dr Jindal brought this to the attention of Dr. Elster (who was the formal supervisor of Drs. Jindal and Hawksworth).

49. Dr. Elster ignored Dr. Jindal's report of these false accusations by Dr. Hawksworth, and encouraged this unethical behavior, stating "maybe this is true."

50. Dr. Elster demonstrated poor leadership by encouraging rumor mongering and not taking appropriate corrective action.

51. Dr. Jindal complained and documented in memos to himself on his personal e-mail (to save and initialize times and dates) that Dr. Hawksworth canceled clinics and operative procedures repeatedly at WRNMMC so that he could work as a volunteer or *locum tenens* surgeon at Georgetown University Hospital.

52. Dr. Jindal complained to Dr. Elster, and documented, that Dr. Hawksworth was on call at two hospitals (WRNMMC and Georgetown University Hospital) simultaneously from March 13, 2015 to March 19, 2015, and on August 4, 2016, August 29, 2016, September 22, 2016, and April 4, 2017, jeopardizing veterans and the reputations of WRNMMC, USUHS and the Federal Government.

53. This practice is illegal and unethical and can put the lives of patients at risk as Dr. Hawksworth would have been unable to handle emergencies, if required, at both hospitals.

54. Dr. Elster failed to take any corrective action.

55. Dr. Hawksworth canceled planned operations at WRNMMC (such as on August 25, 2016) so that he could perform *pro bono* liver transplants at Georgetown University Hospital.

56. This practice wasted operating room and bed space which could have been used by other physicians and patients.

57. Dr. Elster was informed but failed to take any corrective action.

58. Dr. Jindal complained to Dr. Elster that Dr. Hawksworth was canceling planned clinics on multiple occasions (including on September 7, 2016, November 8, 2016, April 17, 2017, and June 16, 2017).

59. These cancellations caused severe inconvenience to veterans at WRNMMC and resulted in wastage of clinic slots and patients' time.

60. Dr. Elster was informed but failed to take corrective action.

61. Dr. Hawksworth publicly remarked that Dr. Bohen was malingering and not sick on September 19, 2016. This occurred when Drs. Jindal and Hawksworth were performing a kidney transplant. Others present included surgical resident Dr. Will Parker and scrub nurse Brittany (last name unknown).

62. Dr. Hawksworth, on May 9, 2017, publicly criticized the radiology residents for giving "incorrect" and "wrong" reports on MRIs and said that they "cannot be trusted" during ward rounds in the presence of multiple medical providers.

63. This was a recurring pattern of unethical behavior by Dr. Hawksworth and violated the Hippocratic Oath.

64. Dr. Elster, as a supervisor, failed to take corrective action or inform the leadership of WRNMMC's Radiology Department.

65. Dr. Hawksworth performed an organ procurement/retrieval in Texas while simultaneously on call at Walter Reed on June 2, 2017.

66. This could have resulted in a surgeon not being available for potential emergencies at WRNMMC.

67. Dr. Hawksworth did not inform any other physician and the organ transplant service at WRNMMC was "uncovered" for surgical emergencies.

68. Dr. Elster was informed but failed to take corrective action or inform the leadership of WRNMMC.

69. Dr. Hawksworth maliciously and repeatedly asked Dr. Jindal why he was closing the door of his office and having coffee with Dr. Bohen.

70. Dr. Elster, as he had done when Dr. Jindal complained about Dr. Ottman, told Dr. Jindal to allow Dr. Hawksworth to "mature" into the position and said Dr. Jindal should be subservient to military officers (e.g., Dr. Ottmann and Dr. Hawksworth).

**Dr. Jindal filed a complaint with the Maryland Board of Physicians against Dr. Ottmann.**

71. On September 12, 2017, Dr. Jindal filed a complaint against Dr. Ottmann with the Maryland Board of Physicians.

72. In the complaint, Dr. Jindal alleged that Dr. Ottmann had been fired from facilities in Rochester, New York and Harrisburg, Pennsylvania at which he had worked as a locum tenens physician.

73. The complaint further alleged that Dr. Ottmann had been asked not to return to Georgetown University Hospital and University of Maryland Hospitals where he did *pro bono* work.

74. Finally, the complaint detailed Dr. Ottmann's inappropriate and discriminatory interactions with staff at Walter Reed, as well as reports of similar interactions at other facilities.

75. Dr. Jindal made this complaint under the pseudonym "John Lyndsay."

**USUHS and Walter Reed began an investigation of Dr. Jindal.**

76. On April 27, 2018, USUHS and WRNMMC were contacted by Dr. Ottmann's lawyer, who said that in response to complaints made about Dr. Ottmann to the Board by "John Lyndsay," Dr. Ottmann had sued "John Lyndsay" and had obtained information that linked the source of the complaint to the Board against Dr. Ottmann to Dr. Jindal.

77. Dr. Ottmann's lawyer alleged that Dr. Jindal had violated HIPAA by sending information about a patient to the Board without permission.

78. Dr. Ottmann's lawyer demanded that an investigation of Dr. Jindal be launched.

**USUHS investigated the complaints filed with the Board against Drs. Ottmann and Hawksworth.**

79. Dr. Jindal was investigated by USUHS's Office of the Inspector General from May 2018 through October 2018.

80. The investigation report was released on October 19, 2018, stating that Dr. Jindal had filed false complaints against Dr. Ottmann and Dr. Hawksworth.

81. The report acknowledged that Dr. Ottmann was not a federal employee at the time of the complaint and the complaint had not been made to a federal entity.

82. Despite the findings of this investigation report, the complaints filed with the Board by Dr. Jindal were not false.

83. Dr. Jindal had a duty under his Hippocratic Oath to report these allegations.

84. Having heard from trusted colleagues that Dr. Ottmann had exhibited behavioral traits that warranted his dismissal from other medical facilities; having observed Dr. Ottmann's treatment of Dr. Bohen and Ms. Acker; and having personal knowledge of the formal disciplinary inquiry by Walter Reed, Dr. Jindal reasonably concluded that Dr. Ottmann's

behavior should be reported to the Maryland Board of Physicians because Dr. Ottmann was a danger to public health or safety.

**WRNMMC, on December 15, 2018, suspended Dr. Jindal's privileges pending its own investigation.**

85. On November 29, 2018, WRNMMC sent Dr. Jindal a letter stating that his privileges had expired but that due to the USUHS's investigation, WRNMMC would conduct its own investigation before renewing Dr. Jindal's privileges.

86. Walter Reed suspended Dr. Jindal's privileges on December 15, 2018.

**Dr. Jindal's attorney contacted USUHS and WRNMMC.**

87. In January 2019, Dr. Jindal's attorney at that time, Mr. George Chuzi, contacted WRNMMC and USUHS on behalf of Dr. Jindal.

88. Mr. Chuzi stated the following:

   a. there was no evidence that Dr. Jindal knew that anything he reported to the Board of Physicians was false;

   b. relevant witnesses had not been interviewed;

   c. the OIG was criticizing Dr. Jindal for anonymous reporting while relying on reports about patient care from an anonymous witness;

   d. Dr. Jindal, under HIPAA, was permitted to disclose the information he disclosed to the Board because of the nature of the allegations and his concerns; and

   e. Dr. Jindal's disclosures to the Board were protected under the Whistleblower Protection Act.

89. After receiving Mr. Chuzi's letter, USUHS promptly cleared Dr. Jindal of all wrongdoing and did not discipline him.

90. But WRNMMC did not restore Dr. Jindal's privileges, which remained suspended.

91. Dr. Jindal continued working on the staff at USUHS but without the privileges to perform surgery.

**WRNMMC concluded its investigation in July 2019 but withheld the results until April 2020.**

92. WRNMMC concluded its investigation in July 2019.

93. The investigation conducted by WRNMMC found the allegations against Dr. Jindal regarding alleged HIPAA violations and misleading a federal agency unsubstantiated.

94. The investigation conducted by WRNMMC also identified no clinical or patient issues related to Dr. Jindal's patient care.

95. The investigation conducted by WRNMMC found, incorrectly, the allegations regarding the filing of a false complaint to be substantiated. However, WRNMMC stated it had no jurisdiction over this allegation because USUHS was Dr. Jindal's employer, not WRNMMC.

96. WRNMMC did not notify Dr. Jindal that it had closed its investigation and instead continued to withhold his surgical privileges.

97. WRNMMC continues to withhold Dr. Jindal's surgical privileges as of the filing of this complaint.

98. WRNMMC also failed to give a copy of a peer review to Dr. Jindal so that he could review and potentially rebut the adverse findings, if any, despite multiple reminders to WRNMMC by one of Dr. Jindal's attorneys, Ms. Natasha Wesker.

**In March 2020, USUHS blocked an employment opportunity for Dr. Jindal at the FDA; and, on April 23, 2020, terminated Dr. Jindal's employment, purportedly due to his lack of privileges.**

99. Dr. Jindal applied for a job with the FDA while his privileges remained suspended.

100.      Dr. Jindal received an offer from the FDA to work as a reviewer.

101.    During the FDA's onboarding process, the FDA contacted Dr. Elster, who retaliated against Dr. Jindal by providing negative and "hurtful" information about him to the FDA, according to the recruiting physicians at the FDA.

102.    Mr. Chuzi contacted Mr. Stephen Weiss in USUHS's Office of General Counsel regarding the negative information.

103.    Dr. Elster did not provide any explanation for the negative (and false) information he had provided to the FDA regarding Dr. Jindal.

104.    Dr. Elster's comments caused the FDA to rescind its offer of employment to Dr. Jindal in March 2020.

105.    In late March 2020, Dr. Jindal retained the services of Ms. Natasha Wesker, a specialist in privileging and credentialing issues.

106.    Ms. Wesker contacted WRNMMC and USUHS on multiple occasions regarding the harm to Dr. Jindal caused by the prolonged investigation and his suspended privileges.

107.    In a June 11, 2020 submission to WRNMMC, she said, "Mr. Chuzi defended Dr. Jindal's absolute protected right under Maryland law, to file a report with the Maryland Board of Physicians ("the Board") without fear of reprisal. WRNMMC neglected to reply to Dr. Jindal or his attorney; instead, withholding his clinical privileges from December 25, 2018 until February 19, 2019, when Mr. Chuzi was informed that a . . . 'medical Quality Assurance Investigation (QAI) pursuant to DoD Manual 6025.13 re: concerns about Dr. Jindal's clinical practice is ongoing. The results of the investigation are considered confidential pursuant to 10 USC 1102.' At no time did WRNMMC substantively respond to Dr. Jindal's whistleblower defense under Maryland Law."

108.     In the same submission, Ms. Wesker also said, "Nearly six (6) months elapsed before USUHS, on August 1, 2019, advised Mr. Chuzi that 'Walter Reed has completed its review of Dr. Jindal. The report needs to go through a number of different Walter Reed officials before a final decision is made. CAPT [Eric] Elster believes that the matter will be completed in a few weeks.' The 'review' referenced by USUHS presumably was the QAI; however, USUHS indicated that it had not been advised of the results."

109.     Further, Ms. Wesker stated, "No Peer Review Panel ("PRP") was convened in October, November, December of 2019, nor was one convened in January, February, March, April, or May of 2020. Instead, WRNMMC withheld Dr. Jindal's clinical privileges, neither terminating, nor restricting; neither renewing nor not renewing; neither deciding nor not deciding on the fate of Dr. Jindal's continued employment with USUHS nor his continued clinical privileges to perform transplant surgery at the one and ONLY military hospital in the nation where such a complex surgery could be safely performed."

110.     In summary, Ms. Wesker noted that, pursuant to DoD 6025.13, there was no "adverse clinical finding" against Dr. Jindal and after July 2019, no purpose was served by continuing to withhold Dr. Jindal's clinical privileges because patient risk was deemed not substantiated by the Credentials Committee and Col. Barr.

111.     Ms. Wesker also noted that there was no need whatsoever for a Peer Review Panel to evaluate a clinical adverse action because there was none to evaluate; and the claim that the delay in convening a PRP resulted from the desire to secure the expertise of a transplant surgeon was not plausible based on Col. Barr's unequivocal decision that Allegations #2 and #3 were unsubstantiated.

112.     On April 23, 2020, USUHS terminated Dr. Jindal's employment.

113.    On June 3, 2020, Capt. T.G. Patel, USN, MD, (retired), was hired by Dr. Jindal to review 21 patient charts cited by WRNMMC.

114.    Dr. Patel, a Board-Certified, recognized leader in nephrology, is a retired naval officer; former chief of medical staff at the Naval Medical Center in Portsmouth, VA; former director, surface medicine for BUMED; former program director at the Veterans Administration in Washington; and current associate professor at USUHS.

115.    He is intimately familiar with QA investigations, having conducted many himself while in Portsmouth.

116.    Dr Patel stated that "Based on the charts I reviewed, there is no question of his [Dr. Jindal's] clinical competency. His 21 cases spanning a 4-year period, were all uncomplicated and successful. I spent time reviewing several of the charts in great detail, noting that they included the chief complaint, medication list, past history, current issues and treatment plan w/activity schedule and wound care instructions. Documented discharge planning was appropriate as well as scheduled follow up. By all documented accounts, not only was Dr. Jindal's care excellent, but his supervision and training of residents was also exemplary."

117.    Dr. Patel further stated that "Because WRNMMC is only responsible for approving Dr. Jindal's clinical privileges, and has never been his employer, I find it disconcerting to learn that a Peer Review Panel has been held up for 18 months in order to enlist the help of a transplant surgeon when no clinical issues were substantiated in the 18 July 2019 report issued by the Chair of the Credentials Committee, signed by COL Barr. Although this information was repeatedly requested by Dr. Jindal's attorney, the report was released to Dr. Jindal a mere two weeks ago. Had he been given a copy of this report in a timely manner, the protracted search for a transplant surgeon to serve on the PRP would have been deemed

unnecessary. The issue could have fairly and easily been resolved in July 2019, almost a full year ago."

118.    Dr. Patel stated the following in his letter in support of Dr Jindal: "In my experience with Dr. Jindal over many years, beginning with several complicated patients referred for vascular access and renal transplants, I have personally observed him as a brilliant transplant surgeon with exceptional clinical skills and patient rapport. He provided excellent care to several of my patients, from whom I received glowing feedback. While on a medical mission in Guyana, I came across numerous patients who had been successfully treated by Dr. Jindal, who initiated a renal transplant program, training local staff and providers. . . . In summary, I have found Dr. Jindal to be a highly competent surgeon, an excellent teacher and a skilled clinician. I have personally observed his rapport with patients and have never known him to be anything but kind and understanding."

119.    Dr. Patel concluded, "In my professional opinion, Dr. Jindal is a valued surgeon whose professional credentials and experience as well as his personal humanity towards others less fortunate, are a genuine asset to WRNMMC and the Uniformed Services University of the Health Sciences. I am hopeful that my review is helpful in supporting Dr. Jindal's request that his clinical privileges be immediately approved."

**On December 17, 2020 WRNMMC held a Hearing Panel to determine findings, conclusions, and recommendations on each allegation listed in the Hearing Panel notice. But the Panel's January 14, 2021 findings ignored or unjustifiably rejected Dr. Jindal's credible testimony and its findings regarding his motives and his purported "reckless disregard for the truth" were unsupported by the record.**

120.    The Panel found that Dr. Jindal behaved in a manner unbecoming of a federal employee and inconsistent with continued practice at WRNMMC; and recommended that all of

Dr. Jindal's WRNMMC credentials should be permanently revoked and Dr. Jindal should be removed from all patient care duties.

121.    On December 17, 2020, a Hearing was held, and Dr. Jindal presented documents and testimony. WRNMMC did not call any witnesses.

122.    Dr. Jindal credibly testified that Dr. Ottmann made discriminatory comments about Dr. Jindal's nation origin (and about Indians generally), made sexist remarks to Dr. Bohen and Caroline Aker, and that he complained about Dr. Ottmann and these issues to the Chairman of the Department of Surgery, Dr. Elster, in 2014.  He also credibly testified that Dr. Elster took no action and provided no assistance. Dr. Jindal credibly testified that after complaints from other staff members, including Dr. Bohen and Ms. Aker, USUHS suspended Ottmann and forced him to step down as head of transplant surgery.

123.    Dr. Jindal credibly testified that Dr. Hawksworth targeted Dr. Jindal with racist comments similar to Dr. Ottmann's comments, and targeted Dr. Bohen and Ms. Aker. Dr. Jindal credibly testified that he complained to Dr. Elster about Dr. Hawksworth, and Dr. Elster again took no action.

124.    Dr. Jindal credibly testified as follows regarding his motivation for filing the February 11, 2014 complaint to the Maryland Board of Physicians against Dr. Hawksworth and his good faith belief that the complaint was accurate: A former patient of Dr. Jindal who later became Dr. Hawksworth's patient reported that Dr. Hawksworth had not properly warned her of the risks of surgery; said she suffered liver damage as a result; and asked that Dr. Jindal file a complaint. Dr. Jindal credibly testified that he urged the patient to go to the Board herself, but she did not want to do so. Dr. Jindal credibly testified that he then made the complaint because he was concerned about patient safety and had a moral duty to report the patient's concerns; and

17

he had no other motive. He had already complained to Dr. Elster about Dr. Hawksworth and Dr.

Elster had taken no action.

125.     Dr. Jindal also credibly testified that he had an absolute right under the

Whistleblower Protection Act to file the complaint with the Board; that there was nothing in the

complaint that he knew was not true and he had no reason to believe that the information shared

by the patient about Dr. Hawksworth was inaccurate; and that he has not since received any

information that causes him to believe the information he had received from the patient was

inaccurate.

126.     Dr. Jindal credibly testified that he suggested Dr. Hawksworth should be

reprimanded because he believed some action was warranted based on the information received

from the patient, and a reprimand was, to his knowledge, the least severe action; had he made the

complaint with malice, he would have suggested more severe discipline.

127.     None of the above testimony was contradicted by any evidence presented at the

hearing on December 17, 2020.

128.     Dr. Jindal credibly testified as follows regarding his motivation for filing

complaints against Dr. Ottmann with the Maryland Board of Physicians in 2016 and with Johns

Hopkins in 2017 and his good faith belief that the complaints were accurate: Dr. Jindal filed the

complaints because he was concerned about patient safety and had a moral duty to report his

concerns; he had no other motive; and he had already complained to Dr. Elster about Dr.

Ottmann and Dr. Elster took no action.

129.     Dr. Jindal credibly testified that he relied on information provided by Dr.

Ottmann's supervisors at other facilities and information provided Dr. Bohen and Ms. Aker, with

regard to the 2016 complaint's allegations that Dr. Ottmann had lied on license renewal

application forms and had failed to inform the Board of multiple cases of dismissal and disciplinary hearings.

130.     Dr. Jindal credibly testified that he filed the April 23, 2017 complaint against Dr. Ottmann with Johns Hopkins because he was concerned about patient safety and had a moral duty to report his concerns; and he had no other motive and had already complained to Dr. Elster. He credibly testified that he had no reason to believe the information about Dr. Ottmann in this complaint was inaccurate—and he relied on his personal knowledge and information provided by Dr. Bohen and Ms. Aker.

131.     None of the above testimony was contradicted by any evidence presented at the hearing on December 17, 2020.

132.     Dr. Jindal also credibly testified that the USUHS Office of the Inspector General had investigated the above complaints and had cleared him of wrongdoing and did not discipline him—though USUHS later had to terminate Dr. Jindal because WRNMMC had suspended his privileges (and for no other reason).

133.     None of the above testimony was contradicted by any evidence presented at the hearing on December 17, 2020.

134.     Dr. Jindal also credibly testified that whether he engaged in "Conduct Unbecoming a Federal Employee" could only be determined by his actual employer, USUHS, and it was beyond the reach of WRNMMC to consider, evaluate, or decide whether his conduct as a federal employee of USUHS was "unbecoming"—and that USUHS had determined that his conduct was NOT unbecoming, took no action, and continued to employ him for an extended period despite his privileges being withheld by WRNMMC.

135.    None of the above testimony was contradicted by any evidence presented at the hearing on December 17, 2020.

136.    Dr. Jindal credibly testified that on October 5, 2020, the Credentials Committee recommended that his application should be allowed to proceed through the privileging process with an additional FPPE related to professionalism and did not concur with the earlier recommendation to deny his privileges—though Col. Barr did not concur with the October 2020 recommendations.

137.    None of the above testimony was contradicted by any evidence presented at the hearing on December 17, 2020.

138.    The Panel's findings ignored or unjustifiably rejected Dr. Jindal's credible testimony and its findings regarding his motives and his purported "reckless disregard for the truth" are unsupported by the record.

139.    On February 1, 2021, Dr. Jindal opposed the Hearing Panel's Findings and Recommendations in a written response, citing the above-referenced deficiencies in the Panel's Findings and Recommendations.

140.    On February 26, 2021, Col Barr notified Dr. Jindal of the Panel's final decision to revoke his privileges due to their finding that he had "behaved in a manner unbecoming of a federal employee."

141.    On March 4, 2021, Dr. Jindal appealed the Hearing Panel's final decision, citing again all the above referenced deficiencies with the Panel's findings.

## COUNT I
## RETALIATION FOR
## WHISTLEBLOWING
## 5 U.S.C. § 2302(b)(8) and § 2302(b)(9)

142.    Jindal herby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

143.    Jindal engaged in protected activity under 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 2302(b)(9) when he filed the February 11, 2014 complaint to the Maryland Board of Physicians against Dr. Hawksworth due to his good faith belief that the complaint was accurate and when he filed complaints against Dr. Ottmann with the Maryland Board of Physicians in 2016 and with Johns Hopkins on April 23, 2017, and that this was due to his good faith belief that the complaints regarding patient safety were accurate.

144.    The Department of Defense and more specifically USUHS and WRNMMC took adverse actions against Dr. Jindal when (1) WRNMMC suspended his privileges even after the USUHS Office of the Inspector General investigated the complaints Dr. Jindal had made about Dr. Hawksworth and Dr. Ottmann and cleared Dr. Jindal of wrongdoing and did not discipline him, (2) WRNMMC concluded its investigation into Dr. Jindal in July 2019 but continued the suspension of his privileges until his termination in April 2020, (3) Dr. Jindal had to request no less than 11 times, in writing, clarification of the "due process, adequate notice and fair hearing," (4)  refused to provide any citation, reference or specific policy, rule or regulation permitting the violations of Dr. Jindal's due process protections, (5) Dr. Elster's retaliatory comments caused the FDA to withdraw its offer of employment to Dr. Jindal, and (6) USUHS terminated Dr. Jindal.

145.    The temporal proximity between Dr. Jindal's protected activity and the adverse actions the Department of Defense, and more specifically USUHS and WRNMMC, took against

him are sufficiently close to indicate causation; and other evidence supports a finding that the adverse actions were caused by retaliatory animus.

146.     The Department of Defense's purported reasons for its adverse actions against Dr. Jindal employment are pretextual.

## **PRAYER FOR RELIEF**

Based on the foregoing, Jindal respectfully requests that he be awarded the following relief against USUHS and WRNMMC:

  a.  back pay, bonuses, and related benefits;
  b.  reinstatement to all original conditions of Dr. Jindal's employment;
  c.  any other reasonable and foreseeable consequential damages;
  d.  attorney's fees;
  e.  costs and personal time associated with seeking this relief; and
  f.  any other relief this Honorable Board deems just and proper to award.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for any and all issues proper to be so tried.


Dated: April 7, 2021                      Respectfully submitted,



                                          */s/ John T. Harrington*_____
                                          R. Scott Oswald
                                          John T. Harrington
                                          The Employment Law Group, P.C.
                                          1717 K St. NW, Suite 1110
                                          Washington, DC 20006
                                          (202) 261-2830
                                          (202) 261-2835 (facsimile)
                                          soswald@employmentlawgroup.com
                                          tharrington@employmentlawgroup.com
                                          *Counsel for Appellant*